IN THE

# United States Court of Appeals

## FOR THE FOURTH CIRCUIT

# THOMAS A. DAVIS,
### *Plaintiff-Appellant,*

v.

# MPW INDUSTRIAL SERVICES, INC.,
### *Defendant-Appellee.*

---

## OPENING BRIEF OF APPELLANT

---

### ON APPEAL FROM THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF SOUTH CAROLINA
### AT GREENVILLE

William Andrew Arnold
LAW OFFICE OF W. ANDREW
ARNOLD, P.C.
712 East Washington Street
Greensville, South Carolina 29601-0000
(864) 242-4800 (Telephone)
(864) 242-4885 (Facsimile)
aarnold@aalawfirm.com

Counsel for Plaintiff-Appellant

---

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Only one form needs to be completed for a party even if the party is represented by more than one attorney.  Disclosures must be filed on behalf of all parties to a civil, agency, bankruptcy or mandamus case.  Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.  Counsel has a continuing duty to update this information.

No. __12-1352__      Caption: __Thomas A. Davis v. MPW Industrial Services, Inc.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Thomas A. Davis__
(name of party/amicus)

_____

who is _____Appellant_____, makes the following disclosure:
            (appellant/appellee/amicus)

1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?                ☐ YES ☑ NO
      If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                ☐ YES ☑ NO
      If yes, identify all such owners:

- 1 -

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?  ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
    If yes, identify any trustee and the members of any creditors' committee:

## CERTIFICATE OF SERVICE
**************************

I certify that on ___March 28, 2012___ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Phillip A. Kilgore, Esquire
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
P.O. Box 2757
Greenville, SC 29602

Jeffrey P. Dunlaevy, Esquire
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
P.O. Box 2757
Greenville, SC 29602

___s/ W. Andrew Arnold___                    ___March 28, 2012___
(signature)                                          (date)

11/17/2011
SCC

ii

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT .................... i

TABLE OF CONTENTS ............................. iii

TABLE OF AUTHORITIES ............................. v

JURISDICTIONAL STATEMENT ......................... 1

STATEMENT OF THE ISSUES .......................... 2

STATEMENT OF THE CASE ............................ 2

STATEMENT OF THE FACTS ........................... 3

SUMMARY OF THE ARGUMENT ......................... 20

STANDARD OF REVIEW ............................. 24

ARGUMENT ....................................... 27

I.   THE  DAMAGE  AWARD  OF  THE  JURY  WAS  AGAINST
     THE  CLEAR  WEIGHT  OF  THE  EVIDENCE  AND  BASED
     UPON FALSE EVIDENCE. ........................ 27

II.  FAILURE  TO  GIVE  APPELLANT'S  REQUESTED  JURY
     INSTRUCTION   ON   CONSTRUING   AMBIGUOUS
     CONTRACTS  AGAINST  DRAFTER  WAS  AN  ABUSE  OF
     DISCRETION. ............................... 33

III. APPELLANT IS ENTITLED TO AN AWARD OF TREBLE
     DAMAGES  AND/OR  REASONABLE  ATTORNEY  FEES
     UNDER S.C. CODE SECTION 41-10-80(c). ......... 47

iii

A. Applying the "Balancing Approach" of *Futch*, this Court Should Reject Appellee's Belated Assertion of the Good Faith Defense. ...........................49

B. In Applying the "Balancing Approach" This Court Should Consider the Remedial Purpose of the Act and Public Policy For Awarding Attorney Fees. ...................62

CONCLUSION ........................................67

CERTIFICATE OF COMPLIANCE .........................68

CERTIFICATE OF SERVICE ............................69

ADDENDUM

# TABLE OF AUTHORITIES

**CASES**                                    **PAGE**

*Able v. Carolina Stalite Co., Ltd. P'ship*,
345 F.Supp.2d 527, 532-33 (M.D.N.C. 2004) ........28

*Atlas Food Sys. & Services, Inc. v. Crane Nat.
Vendors, Inc.*, 99 F.3d 587, 594 (4th Cir. 1996) ..27

*Bazzle v. Green Tree Financial Corp.*,
351 S.C. 244, 262, 569 S.E.2d 349, 358 (2002),
*vacated on other grounds,* 123 S.Ct. 2402,
156 L.Ed.2d 414 (2003) ..........................37

*Bell v. U.S.*,
521 F.Supp.2d 456, 460 (D. Md. 2007) .............46

*Bennett v. Fairfax County, Va.*,
432 F. Supp. 2d 596, 599 (E.D. Va. 2006) .........27

*Bryant v. Aiken Reg. Med. Ctrs., Inc.*,
333 F.3d 536, 546 (4th Cir. 2003) ................29

*Burnley v. Short*,
730 F.2d 136, 140 (4th Cir. 1984) ................58

*Café Associates, Ltd. V. Gerngross*,
305 S.C. 6, 9, 406 S.E.2d 162, 164
(S.C. 1991) ...................................34,35

*Carolina Ceramics, Inc. v. Carolina Pipeline
Co.*, 251 S.C. 151, 155-56, 161 S.E.2d 179, 181
(1968) ...........................................37

*Chesapeake Paper Prods. Co. v. Stone & Webster
Eng'g Corp.*, 51 F.3d 1229, 1237
(4th Cir. 1995) ..............................24,25

*Cooper & Griffin v. Bridwell*, 181 S.E. 56, 59
(S.C. 1935) .................................22,35

*Ecclesiastes Prod. Ministries v. Outparcel
Associates, LLC*, 374 S.C. 483, 500,
649 S.E.2d 494, 503 (S.C. Ct. App. 2007) ........35

*Edens v. Laurel Hill, Inc.*, 247 S.E.2d 434, 436
(S.C. 1978) .....................................41

*Electro Lab of Aiken, Inc. v. Sharp Const. Co.
of Sumter, Inc.*, 357 S.C. 363, 369,
593 S.E.2d 170, 173 (S.C. App. 2004) ............41

*Futch v. McAllister Towing of Georgetown, Inc.*,
335 S.C. 598, 605, 612, 518 S.E.2d 591, 598
(1999) ......................................*passim*

*Hawkins v. Greenwood Dev. Corp.*, 328 S.C. 585,
592, 493 S.E.2d 875, 878 (Ct. App. 1997) ........37

*In re Lone Star Indus. Inc., Concrete R.R. Cross
Ties Litig.*, 882 F. Supp. 482, 492
(D. Md. 1995) ...................................25

*King v. McMillan*, 594 F.3d 301, 314–15
(4th Cir. 2010) .............................24,25

*Knussman v. Maryland*, 272 F.3d 625, 647
(4th Cir. 2001) .................................27

*Linder v. Paramount Acceptance Corp.*,
291 S.C. 539, 543, 354 S.E.2d 567, 569
(S.C. Ct. App. 1987) ........................49,50

*Long v. Boston Scientific Corp.*,
665 F. Supp. 2d 541, 553 (D.S.C. 2008) ..........66

*Mathis v. Brown & Brown of S. Carolina, Inc.*,
389 S.C. 299, 315-16, 698 S.E.2d 773, 775-82
(2010), *reh'g denied* (Sept. 22, 2010) ...24,42,43,54

*Myrtle Beach Lumber Co., Inc. v. Willoughby*,
276 S.C. 3, 8, 274 S.E.2d 423, 426
(1981) ..................................35,36,37,40

*Nehi Bottling Co., Inc. v. All-American Bottling
Corp.*, 8 F.3d 157, 162 (4th Cir. 1993) ...........39

*Noel v. Artson*, 641 F.3d 580, 586-87
(4th Cir. 2011) ..............................25,26,38

*O'Neal v. Intermedical Hosp. of S. Carolina*,
355 S.C. 499, 510-11, 585 S.E.2d 526, 532
(S.C. Ct. App. 2003) .........................52,53

*Quesinberry v. Life Ins. Co. of N. Am.*,
987 F.2d 1017, 1029 (4th Cir. 1993) ...........64,65

*Respect Inc. v. Committee on Status of Women*,
781 F. Supp. 1358 (N.D. Ill. 1992) ...........41,42

*Rice v. Multimedia, Inc.*, 318 S.C. 95, 99-100,
456 S.E.2d 381, 383-84 (S.C. 1995) ...........*passim*

*Rogers v. Savings First Mortgage, LLC*,
362 F.Supp.2d 624, 638 (D. Md. 2005) ..........58,59

*Ross v. Ligand Pharmaceuticals, Inc.*,
371 S.C. 464, 472, 639 S.E.2d 460, 465
(S.C. Ct. App. 2006) .........................60,61

*Safranek v. Copart, Inc.*, 379 F.Supp.2d 927,
930-31 (N.D. Ill. 2005) ......................63,64

*Sauner v. Pub. Serv. Auth. of South Carolina*,
581 S.E.2d 161, 166 (S.C. 2003) .................40

*Southern Atlantic Financial Services, Inc. v.
Middleton*, 349 S.C. 77, 84, 562 S.E.2d 482, 486
(S.C. App. 2002) ................................36

*Springs and Davenport, Inc. v. AAG, Inc.*,
385 S.C. 320, 326, 683 S.E.2d 814, 817
(S.C. Ct. of App. 2009) ......................22,35

*Teague v. Bakker*, 35 F.3d 978, 985
(4th Cir. 1994) ...........................25,26,38

*Vander Linden v. Hodges*, 193 F.3d 268, 279
(4th Cir. 1999) ................................46

*Wall v. Fruehauf Trailer Services, Inc.*,
123 Fed. Appx. 572, 579-80
(4th Cir. 2005) ..........................26,52,53

*Williams v. Metro Life Ins. Co.*,
609 F.Supp.3d 622, 636 (4th Cir. 2010) ..........63

*Zack v. City of Minneapolis*,
601 F.Supp. 117, 120 (D. Minn. 1985) ............63

## STATUTES

28 U.S.C. §1291 .................................2

28 U.S.C. §1332 .................................1

S.C. Code §41-10-10, *et seq.* ..............2,47,51

S.C. Code §41-10-30(A) .................23,24,60,61

S.C. Code §41-10-40 ............................47

S.C. Code §41-10-50...............................47

S.C. Code §41-10-60...............................59

S.C. Code §41-10-80(C)..................47,49,52,66

## **RULES**

Federal Rule of Civil Procedure 36...............46

Federal Rule of Appellate Procedure 32.1(b)......53

Fourth Circuit Rule of Appellate
Procedure 32.1................................52,53

## **OTHER AUTHORITIES**

17 C.J.S. Contracts §82.......................39,41

17A C.J.S. Contracts §324........................37

Restatement (2d) Contracts §50...................41

## JURISDICTIONAL STATEMENT

After Appellant filed an action in South Carolina state court, Appellee removed this action to the United States District Court for the District of South Carolina, which had jurisdiction pursuant to 28 U.S.C. §1332. The District Court entered final judgment in favor of Appellant upon a jury verdict on March 4, 2011. Appellant filed his motion for new trial on March 22, 2011 (App. 598) and his motion for attorney fees and treble damages on March 31, 2011. (App. 596) The District Court issued the order denying Plaintiff's Motion for Treble Damages and Attorney Fees on December 16, 2011 (App. 600), and the order denying Plaintiff's Motion for New Trial entered February 16, 2012. (App. 606)

Appellant filed his Notice of Appeal on March 15, 2012. (App. 612) This is an appeal from the final judgment in the action that disposes of all the issues of all the parties' claims.

Accordingly, this court has jurisdiction pursuant to 28 U.S.C. §1291.

## STATEMENT OF THE ISSUES

1. Whether the jury's award of damages in the amount of $14,526 was supported by the evidence.

2. Whether the District Court's failure to charge the jury to construe ambiguous written terms of a contract against the drafter was an abuse of discretion.

3. Whether the District Court improperly failed to award treble damages and/or attorney fees to Appellee under the S.C. Wage Payment Statute.

## STATEMENT OF THE CASE

On August 28, 2008, Tom Davis filed a Complaint in state court alleging that MPW Industrial Service, Inc. violated the South Carolina Wage Payment Statute (S.C. Code §41-10-10, *et seq.*) by refusing to pay him a $111,297.07 "new work bonus."[1] Appellant alleged that Appellee had

---

[1] Davis also alleged a breach of contract claim, which was essentially merged into his wage payment

promised in writing to pay him a "new work bonus" upon his promotion to be the Account Manager of the BMW account and that Appellee had failed and then refused to pay the bonus. MPW removed the action to U.S. District Court and filed an Answer denying Davis' allegations. (App. 14)

The case was tried to a jury, which rendered a verdict in Appellant's favor on February 25, 2011; the jury awarded damages in the amount of $14,526. (App. 365) on March 4, 2011, judgment was entered in the favor of Appellant. The Court denied Appellant's request for attorney's fees and treble damages under the South Carolina Wage Payment Act. (App. 600) Appellant moved for a new trial, and the District Court denied this motion.

## STATEMENT OF FACTS

### A. BMW Contract

MPW Industrial Services, Inc.'s (hereinafter "MPW") core business is industrial cleaning, which

---

claim. Davis also sought a declaratory judgment as to the enforceability of a non-compete agreement, but this action was voluntarily dismissed.

includes janitorial work as well as cleaning paint booths, paint recovery slug systems, industrial ovens, and other kinds of industrial equipment and facilities. (App. 35) In November 2004, MPW entered into a contract with BMW Manufacturing Company, LLC to provide facilities management and support services (herein after "BMW Contract"). (App. 366, 36) The BMW Contract was to commence on January 1, 2005. It was a three (3) year contract that could be extended by the parties. The contract's "scope" is stated in Schedule 1, which sets out the tasks to be performed by MPW and the frequency the tasks are to be performed. (App. 366, 37-39) The base amount of the contract was $1,975,001.00 annually for three years. (App. 366, 37-39).

The BMW Contract was intended to be a "level-term" contract, which would be paid in 36 monthly installments of "a little bit over $164,000 month." (App. 40) However, BMW Contract provision 12.1 provided for increases or reductions in scope

4

depending on market-driven fluctuations in production, with possible reductions of up to forty percent. (App. 40) Nonetheless, MPW's baseline revenue projections for the BMW account in 2005 were based upon the revenues and task scope contained in the BMW Contract. (App. 41-42)

The BMW account was served by MPW's Facilities Management Support Services (FMSS) division of which Paul Bechard was General Manager and Dave Barrows was Director of Operations. (App. 42-43) In early 2005, Jody Kerns was the BMW Account Manager and the highest ranking member of management staffed onsite at BMW. As Shane DeFazio, formerly the FMSS Comptroller, testified, the FMSS business model "is predicated on developing long-term relationships with customers through your safety, your quality, overall performance. The goal is obviously, to get in, perform work, expand your services and increase the value of the business." (App. 161)

## B. New Work Bonus

The FMSS is a labor intensive operation and "the big differentiator [from other MPW operating groups] is its more daily interaction with the customer, much more integrated into their production activities." (App. 161) Bechard developed a plan to exploit the daily presence of the account manager and to grow MPW's existing accounts; he wanted to incentivize the account manager to grow the account and to become a *de facto* salesperson. (App. 571-572) Bechard testified that his idea was to give the account manager a 1% commission "new work bonus" instead of paying a sales representative a 3% commission:

> [L]ooking at the intent of the new work bonus, I keep wanting to say commission but new work incentive plan. . . .So it was — there was lot of efficiency there because if you don't have salespeople calling on existing accounts where you have to pay 3 percent commission, then if you come up with a plan to have operation account manager get additional revenue at existing accounts without engaging the salesperson and having to pay the sales commission at 3 percent, it's a pretty effective tool.

(App. 572).

Bechard said his idea was simple:

> And we tried to keep it very simple,
> straightforward. Going back to the
> original intent, the original intent was to
> take our existing accounts and grow the
> existing accounts, the revenue in those
> accounts. So tried not to make it too
> complex.

(App. 571).

In the meantime and instead of waiting on the implementation of a company wide "project booking bonus," Paul Bechard decided to change the compensation package of the BMW account manager to include a 1% commission on increased revenues and communicated these changes to the BMW Account Manager, Jody Kerns. (App. 437, 440) The BMW Account Manager would also receive a fuel card, a laptop and a company vehicle. (App. 440, 49) Bechard testified that "as a P and L owner, I had the authority to act without a policy." (App. 584-585) Kerns asked Bechard whether the 1% be applicable to Tom Davis, and the response was that it would apply to Davis if and when he became the BMW Account Manager. (App. 441) However, in the

spring of 2005, Jody Kerns announced he was leaving MPW. (App. 51)

### C. Tom Davis Becomes BMW Account Manager

Tom Davis was initially hired by MPW at a technician in January 1997 making $8.90/hr. Davis was employed to service the BMW account. (App. 32-33) After joining MPW, Davis rose the ranks quickly becoming a supervisor before being promoted to operations manager in October 2001. (App. 33-34) In July 2005, Kerns asked Davis if he was interested in a promotion to account manager. Davis initially answered "Thank you, Jody, but no thank you." (App. 51) However, Davis reconsidered and advised Kerns that if the account manager position was still available then he was interested. (App. 52-53) On July 26, 2005, Dave Barrows, Director of Operations, made Davis a written offer to become account manager, which he hand-delivered to Davis at BMW. (App. 442)

Kerns was in the office when Barrow delivered the written offer. However, when Kerns and Davis

8

read over the offer letter, they both realized that there were certain items of compensation not included: (1) Fuel card, (2) company vehicle, (3) 15% annual bonus, and (4) the 1% new work bonus.[2] (App. 54-56) So, Barrows picked up the phone and said, "I need to call Paul [Bechard]." (App. 56) Davis stood there watching and listening as Barrows communicated over the phone the terms of compensation omitted from the offer letter, including "[t]he one percent new work bonus…." (App. 56-57) As Barrows reiterated the list omitted terms over the phone, Barrows handwrote three bullet points on the written offer letter; the items handwritten on the July 26th letter are exactly as follows:

- *Truck and Fuel card*

- *15% Bonus based on turnover, OSHA goals, and audit scores as outlined in the contract.*

- *New work bonus for increase of contract at BMW.*

---

[2] Davis already had a laptop.

(App. 442, 56-57)(emphasis added)   And then Dave Barrows signed and dated the handwritten portions. (App. 442, 57)   After taking a night to sleep on it, Tom Davis signed the offer letter accepting the position of BMW Account Manager. (App. 60)

Davis testified (and no one disputed) that Davis received all of the compensation in the offer letter, including the handwritten terms—a truck, the fuel card, the salary and the 15% bonus. (App. 57-59)   Although Davis would never be paid one penny of the new work bonus, General Manager Bechard conceded that Davis had earned it and should have been paid:

> Q.   Did it appear that he was motivated by the promise of a 1% new work bonus?
>
> A.   Well, it would sure motivate me.
>
> Q.   And did—from 2005, July 2005 at the time Tom Davis became account manager at [MPW], until the time he left did the gross---billed revenues increase substantially for [the BMW account]?
>
> A.   Yes, sir, they did.

Q. And so, at least on the surface, it appears that the new incentive bonus worked in that case?

A. Yes. It met the intent.

Q. Did—did Tom Davis earn a new work bonus?

A. Yeah, absolutely.

Q. And is it in your view is he owed that new work bonus as promised?

A. Yes, I think he is. Again, I expressed my disappointment, you know from a credibility standpoint promising people things that weren't delivered upon.

(App. 589-590)

However, Bechard's idea of a company wide project booking bonus was never implemented. In fact, the idea of a company wide project booking bonus was never discussed with Davis. (App. 50-51) Davis never even saw the draft of the project booking bonus plan. (App. 51) Davis knew only of the promise made to him in the July 26, 2005 offer letter.

### D. BMW Account Revenues Increase Significantly

Although it took almost a year, Tom Davis and MPW began to see additional BMW work beyond the scope of the contract to be handled by MPW, which required additional manpower and generated additional revenue. The BMW contract provided for baseline revenues equal to $493,577 each quarter. However, the first quarter of 2005 showed actual revenues of $523,266. (App. 456) However, by the end of the first quarter of 2006, revenues generated by the BMW contract skyrocketed to over $1 million, which was double the baseline contract amount. (App. 456) By the end of the first quarter 2007, revenues generated were $2.9 million, which was six times the contract baseline. (App. 456) Bechard believed the growth was attributable to the new work bonus: "And the record shows, the record being the substantial increase—it was our number one account for growth. So, it worked." (App. 585)

However, the growth did not happen by accident. As his 2007 performance evaluation noted, Tom was working "80 to 100 hours a week and virtually every day of the year." (App. 92-94) Bechard pleaded with Davis to take some time off. (App. 589) His review noted that Davis was "[a]chieving desired results." And MPW credited Davis for the largest revenues streams that had come from outside the BMW contracts, noting in his performance review: "Developed the Faurecia and Stankiewicz projects." (App. 93)

From July 2005 through May 2008, MPW's quarterly profit statements reveal a phenomenal "increase in the BMW contract." The total increase of revenues over the contract baseline during this period was $11,128,826.69.[3] (App. 456)

_____

[3] The information comes directly from the voluminous monthly reports that were admitted as Joint Exhibit 2 and which is summarized in the first column of the first page of Joint Exhibit 31 (456). However, since the information contained in those monthly reports is not critical to the issues in this appeal, the parties agreed to exclude them from the appendix.

Bechard testified that the method of calculation of the one-percent bonus was very simple:

> Q. So, with respect to this—this case with Mr. Davis if he starts in the position on July 26, 2005, you would take the snapshot on July 1, 2006?
>
> A. No. '05.
>
> Q. Was it any — any new dollars on an account or were there particular types of expansion that it was covering?
>
> A. No. We kept it very simple. It was based on, like I mentioned earlier, the budgeted revenue amount, the baseline, and in this case it would have been July 1 of '05, any incremental increase, regardless of the nature, if that's what your asking. It was — it was billed and booked revenue dollar increase from the baseline. Baseline being the baseline budgeted — budgeted revenue that was set for ***that budget year for each account.***"

(App. 569 lines 16-25, App. 570 lines 1-2) Paul Bechard never disputed that Tom Davis had been promised a one-percent bonus on all gross revenue above the baseline contract amount:

> Q. So, with that authority, you would have promised Tom Davis that he

14

would — that he would receive a new
work bonus of 1 percent for any
increase of the baseline contract
amount after July 2005.

A.   Yes.  That was, to my recollection,
that was the intent.

…

Q.   And any increase above the baseline
budget would entitle —in this case for
BMW — would entitle Tom Davis to a 1
percent of the gross increase?

A.   Of the gross billed revenue, correct.

(App.  585-586)  One  percent  of  this  number  is

$111,297.07.[4]  (App.  315-318)

### E.   Davis Raises The Issue of 1% New Work Bonus:  MPW Affirms/Ratifies Promise.

Davis raised the prospect payment of his new

work bonus several times.  First, in his April 23,

2006 Monday report emailed to the new Director of

_____

[4] If  the  2005  annual  budget  projection  is  "the
snapshot" to set the contract baseline, which is
only 2% different than the contract baseline.  It
should be noted that in Joint Exhibit 30 (455),
Davis prepared his calculations based upon the
incomplete monthly revenue numbers (as compared to
the  quarterly  revenue  numbers  referenced  above).
These  reports  showed  lower  revenues  than  the
quarterly reports made available to Davis late in
discovery.

15

Operations (John Fuertes), Davis reported on the status of the BMW account:

> New Business, a ton of it. BMW paint shop has asked us to hire 90 additional employees…. Incidentally, my contract specifies an additional 1% bonus (above and beyond my 15% bonus) on all new business.

(App. 447) Mr. Fuertes never responded in writing or orally to this first email, although Davis did not expect him to respond.

In September 2006, Davis received a spreadsheet that had his company vehicle listed as "Business Use Only." (App. 73-74) The information on the spreadsheet was different than what had been represented to him. On September 3, 2006, Davis sent John Fuertes and Paul Bechard an email stating that his company vehicle was for both personal and business use. (App. 73-74) Davis took the opportunity to remind Bechard and Fuertes that his offer letter also indicated that "I will be paid 1% of any new business generated in addition to the

15% annual bonus that I receive as the Account Manager." (App. 449, 73-74).

On September 5 (2006), Fuertes asked Davis to forward him a copy of the offer letter, which Davis forwarded on September 6 to Fuertes. (App. 450, 451, 74-75)  Mr. Fuertes forwarded the letter to Bechard and to Jim Neville, Vice President of Human Resources.  Several days later, Paul Bechard called Davis and stated that "I have reviewed your offer letter with Jim Neville.  Jim and I concur that we do owe you the bonus." (App. 76)  Bechard stated, "MPW will pay you this bonus." (App. 76)  Neville also called Davis and congratulated him on the "phenomenal growth" and reiterated that "MPW owes you that money and we have a moral obligation to pay that.  And we will." (App. 77)  Davis testified that he had more than a half a dozens conversations with Bechard and Neville about the new work bonus. (App. 74-84)

In his testimony, Bechard remembered being asked about when payment of the new work bonus

would occur and "my only response would have been I'm waiting to hear back from corporate, which was true." (App. 563) Bechard stated that he was disappointed by Appellee's refusal to pay the promised bonus payments: "[W]hen you promise someone that your team that's working hard is going to be incentivized to grow the business, you know, it's — it's only right that, you know, you follow through on your — on your commitments." (App. 563 lines 18-22).

In November 2006, Neville and Bechard were back at BMW for another meeting when a "bombshell" was dropped: BMW wanted MPW to expand the scope of its efforts and assist Faurecia, a "Tier One Supplier" of BMW. This decision would result in a substantial increase in manpower needed. (App. 80-82) Davis testified that he was "flabbergasted" by the amount of additional work this would represent not just for MPW but for him, the account manager. (App. 82) When Neville saw the look on Davis' face, Neville said, "Don't worry, Tom. The one

percent bonus applies to this work as well as the increased work here at BMW and any other work you get outside of it." (App. 82)

In June 2007, Davis met with Troy Crouch, a human resources representative, who proposed to suspend Davis for being tardy with his emails after Davis' workload became almost unbearable. (App. 86-87) Davis raised the issue of a double standard with MPW and referenced the failure of MPW to timely pay his 1% new work bonus. (App. 87-89) There was no formal response to this complaint by Davis of the failure to pay his new work bonus.

The last two conversations with Paul Bechard and Troy Crouch occurred in May 2008, when Bechard accused Davis of violating company policy by allowing employees to take his unused vacation time. (App. 97-99) Davis raised the issue of the non-payment of his bonus and advised Bechard, "Some people might consider what you have done with me to be fraud, not paying me my one-percent new business bonus." (App. 101) Bechard attempted to deflect

the issue, but Davis persisted. (App. 101-103)  For
the first time, Bechard denied that Davis was owed
a bonus, and Davis raised the prospect of going to
court. (App. 102)  The next week, MPW terminated
Davis. (App. 103-104)  Two weeks later Monte Black,
MPW's  Chief  Executive  Officer,  offered  Davis
another job, but Davis advised that until he was
paid his new work bonus, he would not return to
work for MPW.  (App. 106-108)

## SUMMARY OF THE ARGUMENT

The July 26, 2005 offer letter contained the
written terms of Davis' contract of promotion to
the BMW Account Manager position. A jury found a
meeting of the minds between Davis and MPW on the
method of calculation of the "new work bonus" and
then calculated damages using a different method
based upon a draft policy for a "project working
bonus." However, every witness presented by both
sides  agreed  the  draft  policy  was  never
implemented.  Davis never saw the draft policy;
Davis never even knew the draft policy existed.

Appellee argued strenuously that there was no meeting of the minds; the terms of the offer letter were too ambiguous. Davis' clear understanding of the method of calculation (1% of revenues in excess of the BMW contract baseline) came to $111,297.07. To counter, Appellee introduced a calculation based upon the draft of the project working bonus to demonstrate the sort of bonus that was actually under consideration (albeit unbeknownst to Davis) by MPW. Appellee's counsel explained that the calculation was based upon the draft policy as a "way of showing absence of meeting of the minds only." (App. 296) However, the jury adopted this calculation to render a verdict in the amount of $14,526; the verdict is contradictory, based upon false evidence and against the clear weight of the evidence.

The obvious confusion which produced the inconsistent verdict was compounded by the District Court's refusal to instruct the jury to construe the written terms of the contract against the

drafter. It is long and well established that upon the Court's determination that a contract is ambiguous, "the construction of the contract is for the jury under proper instructions." *Cooper & Griffin v. Bridwell*, 181 S.E. 56, 59 (S.C. 1935).

The law in South Carolina regarding construction is equally clear: "If there is doubt about the construction of a writing, the doubt must be resolved against the drafter and in favor of the party to whom it was delivered." *Springs and Davenport, Inc. v. AAG, Inc.*, 385 S.C. 320, 326, 683 S.E.2d 814, 817 (S.C. Ct. of App. 2009). The central task of the jury was to construe the contract of the parties, and the failure to properly charge the jury on well established rules of construction was an abuse of discretion.

Even so, the evidence was overwhelming that the decision not to pay Davis the new work bonus was bad faith, which would entitle Davis to an award of treble damages and/or attorney fees. As Bechard testified:

Q. Did—did Tom Davis earn a new work bonus?

A. Yeah, absolutely.

Q. And is it in your view is he owed that new work bonus as promised?

A. Yes, I think he is. Again, I expressed my disappointment, you know from a credibility standpoint promising people things that weren't delivered upon.

(App. 589-590). Bechard testified that he attempted to convince corporate to pay the bonus, but when Davis pressed his demand for payment, Appellee's claimed that Davis had "concocted a scheme to further defraud Defendant by pretending to be entitled to over $100,000 in back bonuses he knew he had not earned…." (App. 468)

However, by the time of trial, Appellee had abandoned the attack on Davis' integrity and claimed that it had all been a misunderstanding. The misunderstanding itself was based upon a violation of the S.C. Wage Payment Act's notice provision, which requires notification in writing of the "wages agreed upon." *See* S.C. Code §41-10-

30(A). The District Court overlooked this violation. The District Court focused Appellee's newly asserted defenses not those originally asserted. However, the relevant date for determining whether the employer/defendant reasonably withheld wages is the time at which the wages were withheld, i.e., when the employer allegedly violated the Act." *Mathis v. Brown & Brown of S. Carolina, Inc.,* 389 S.C. 299, 315-16 698 S.E.2d 773, 781-82 (2010), *reh'g denied* (Sept. 22, 2010). It was an abuse of discretion to deny Appellant's motion for treble damages and attorney fees.

## STANDARD OF REVIEW

"In considering a motion for a new trial, a trial judge may weigh the evidence and consider the credibility of witnesses, and if [she] finds the verdict is **[1]** against the clear weight of the evidence, **[2]** is based on false evidence or **[3]** will result in a miscarriage of justice, [she] must set aside the verdict, even if supported by

substantial evidence, and grant a new trial." *King
v. McMillan*, 594 F.3d 301, 314-15 (4th Cir.
2010)(emphasis added) *quoting Chesapeake Paper
Prods. Co. v. Stone & Webster Eng'g Corp.*, 51 F.3d
1229, 1237 (4th Cir.1995). "The decision to grant
or deny a motion for a new trial is within the
sound discretion of the district court and will not
be disturbed absent a clear showing of abuse of
discretion." *Id.* "Principles which guide the
exercise of the Court's discretion in ordering a
new trial on damages are similar to those
applicable to any other motion for a new trial,
whether the verdict is attacked for inadequacy or
excessiveness." *In re Lone Star Indus. Inc.,
Concrete R.R. Cross Ties Litig.*, 882 F. Supp. 482,
492 (D. Md. 1995) *citation omitted.*

A motion seeking a new trial based upon error
in instructing a jury is reviewed for abuse of
discretion. *Noel v. Artson*, 641 F.3d 580, 586-87
(4th 2011 *citing Teague v. Bakker,* 35 F.3d 978, 985
(4th Cir.1994). "A district court will be reversed

for declining to give an instruction proposed by a party only when the requested instruction '(1) was correct; (2) was not substantially covered by the court's charge to the jury; and (3) dealt with some point in the trial so important, that failure to give the requested instruction seriously impaired" that party's ability to make its case.'" *Id.* (citation omitted).

A decision to award treble damages, attorney's fees and costs under the South Carolina Wage Payment Act is reviewed for an abuse of discretion. *Wall v. Fruehauf Trailer Services, Inc.*, 123 Fed.Appx. 572, 579 (4th Circuit 2005) *citing Rice v. Multimedia, Inc.*, 318 S.C. 95, 100, 456 S.E.2d 381, 384 (S.C.,1995)(upholding denial of treble damages and award of attorney fees under the South Carolina Wage Payment Act).

# ARGUMENT

## I. The Damage Award of the Jury Was Against the Clear Weight of the Evidence and Based upon False Evidence.

"The first two prongs of our review standard require a district court to determine purely factual questions: whether the jury's damages award is (1) "against the weight of the evidence" or (2) "based upon evidence which is false." This review encompasses a comparison of the factual record and the verdict to determine their compatibility." *Atlas Food Sys. & Services, Inc. v. Crane Nat. Vendors, Inc.,* 99 F.3d 587, 594 (4th Cir. 1996)(internal citations omitted). When considering a motion for new trial addressing compensatory damages, the trial court should have weighed the evidence and consider the credibility of the witnesses. *See Bennett v. Fairfax County, Va.,* 432 F. Supp. 2d 596, 599 (E.D. Va. 2006) *citing Knussman v. Maryland,* 272 F.3d 625, 647 (4th Cir.2001)(emphasis added). In this case, weighing the evidence regarding damages in light of

the factual findings that must have been present for the jury to find the existence of the contract, the Court can only conclude that the jury damage calculation is either against the weight of the evidence or based upon false evidence.

Appellant's argument is quite simple: If there was in fact a meeting of the minds between Davis and Paul Bechard (General Manager and the authorized agent of MPW for promoting Davis), then damages in the amount $14,526 is contradictory. The evidence permitted either one of two findings: There was no contract or there was a contract to pay Appellant a 1% "new work bonus for the increase of the BMW contract." It would be akin to a jury finding a contract for $5 + $5 and then rendering a verdict for $2.00. The weight of the evidence does not bear out the jury's damage award in light of its finding of a contract. *See Abel v. Carolina Stalite Co., Ltd. P'ship,* 345 F. Supp. 2d 527, 532-33 (M.D.N.C. 2004)("[I]t is the duty of the Court to determine if the amount awarded by the jury is

contrary to law, invalid, inconsistent, or 'against the clear weight of the evidence.'") *citing Bryant v. Aiken Reg. Med. Ctrs., Inc.,* 333 F.3d 536, 546 (4th Cir.2003).

The sources of the confusion are clear: There were two alternative damage calculations presented to the jury. The first was presented by Appellant based upon Appellee's monthly profit reports. This calculation begins with the contract baseline of $1.975 million and calculates one-percent of all annual revenues above this amount, which according to Joint Exhibit 30 is $111,297.07. (App. 455) Tom Davis contends that this is the plain meaning of the language in his offer letter "an increase in the contract at BMW." This is also Paul Bechard's understanding of the language:

> Q. So, with that authority, you would have promised Tom Davis that he would — that he would receive a new work bonus of 1 percent for any increase of the baseline contract amount after July 2005.

A.  Yes.  That was, to my recollection,
            that was the intent.
(App. 585)

Appellee  instead  argued  that  the  terms  were
ambiguous  and  presented  Bechard's  testimony  to
belie the ambiguity:

        Q.  And  any  increase  above  the  baseline
            budget  would  entitle —in  this  case  for
            BMW — would  entitle  Tom  Davis  to  a  1
            percent of the gross increase?

        A.  Of the gross billed revenue, correct.
(App. 585-586)

Shane  DeFazio  testified  that  he  prepared  the
calculations  in  Joint  Exhibit  31,  (App.  456)  and
based  the  first  on  "Bechard's  understanding  of  a
methodology  to  use  budget  as  opposed  to  the  BMW
contract."  (App.  218)    Appellee  constructed  an
alternative  calculation  which  it  contended  resulted
in a bonus calculation of $45,131.[5]  (App. 456)

_____

[5] Of course, the problem with this approach is that
it  ignores  the  fact  the  budget  was  adjusted  to
reflect  the  "new  work."    So,  once  Davis  secured  the
"new  work"  at  BMW,  MPW  increased  the  projected
revenues;  the  budget  is  not  a  "snapshot"  but  a
moving  target.    DeFazio's  approach  also  ignores
Bechard's  clarifying  testimony  in  which  he  states:

However, the jury awarded $14,526. Clearly, the verdict relied upon a third calculation (DeFazio's second calculation) of a bonus of $14,240.86, which was purported to be based upon the draft of the new project booking bonus.[6] Appellant counsel characterized this as "the total you came up for net growth under the Paul Bechard draft policy version." (App. 224) DeFazio agreed and testified as to the relevance of this calculation:

> We kept it very simple. It was based on, like I mentioned earlier, the budgeted revenue amount, the baseline, and in this case it would have been July 1 of '05, any incremental increase, regardless of the nature, if that's what your asking. It was — it was billed and booked revenue dollar increase from the baseline. Baseline being the baseline budgeted — budgeted revenue that was set for _**that**_ _**budget year for each account.**_"

(569-570) (emphasis added). Using the budget in place as of July 1, 2005 produced a calculation that is within two-percent of the calculation in Joint Exhibit 30. (455)

[6] Interestingly, the second page of Exhibit 31 (457) was returned by the jury with the figure $14,240.86 circled and checked.

Q. And again, you are not agreeing that there is a contract bonus due. But all you have done is analyzed based upon the formula that you've seen in the draft policy, correct?

A. Correct, just illustrating the different referrals to this program.

...

Q. All right. So, again, just not agreeing that this an amount owed, but applying the formula, how much did you figure was the understanding under the Paul Bechard formula set forth in the draft policy that was never implemented?

A. $14,240.86

(App. 224-225)

Thus, DeFazio's second calculation was not introduced as an alternative calculation of damages based upon Davis' alleged contract since both sides conceded the policy never went into effect; the uncontradicted evidence proved that Davis never knew the policy existed and had never seen it. Instead, it was introduced to show how out of line Davis' contentions were with the company-wide bonus plan previously under consideration. When Appellant's counsel confronted Appellee's reference

32

to the draft policy, Appellee's counsel responded that he calculation was introduced as "a way of showing absence of meeting of the minds only." (App. 296) It could not have been introduced for any other purpose considering the evidence.

Nonetheless, the jury did find a meeting of the minds of the contracting parties but used a method of calculating damages introduced that was only relevant to demonstrate that there was no meeting of the minds. Thus, we know that the damage award is based upon false evidence and is inconsistent with the evidence. The District Court abused its discretion in not ordering a new trial.

II. **Failure to Give Appellant's Requested Jury Instruction on Construing Ambiguous Contracts Against Drafter Was An Abuse of Discretion.**

In his complaint, Appellant alleged a written contract and attached and incorporated the fully executed July 26, 2005 letter. (App. 442) The letter does not contain all of the terms and conditions of employment, but it provides the most important terms. The letter by its very terms

requires Davis' "formal acceptance of this promotion, by signing and returning this letter." It provides a place for Davis' signature after the phrase "Accepted by." The handwritten portions on the document are signed and dated by the Director of Operations, the person who delivered the written offer to Davis. (App. 442, 57) This is evidence of a written contract, although parol evidence was necessary to provide an additional term. It is undisputed that the written terms of the contact were written by Appellee.

Appellee argued that the July 26, 2005 letter was ambiguous as to the "new work bonus," and presented evidence, including three different bonus calculations to prove ambiguity. "As a general rule, written contracts are to be construed by the Court; but where a contract is ambiguous or capable of more than one construction, the question of what the parties intended becomes one of fact, and the question should be submitted to the jury." *Cafe Associates, Ltd. v. Gerngross*, 305 S.C. 6, 9, 406

S.E.2d 162, 164 (S.C.,1991); see also *Ecclesiastes Prod. Ministries v. Outparcel Associates, LLC*, 374 S.C. 483, 500, 649 S.E.2d 494, 503 (S.C. Ct. App. 2007) (whether a contract's language is ambiguous is a question of law but once the Court finds the language to be ambiguous, evidence may be admitted to show the intent of the parties, which is a question of fact for the jury.) It is long and well established that upon the Court's determination that a contract is ambiguous, "the construction of the contract is for the jury under proper instructions." *Cooper & Griffin v. Bridwell*, 181 S.E. 56, 59 (S.C. 1935).

The law in South Carolina regarding construction is equally clear: "If there is doubt about the construction of a writing, the doubt must be resolved against the drafter and in favor of the party to whom it was delivered." *Springs and Davenport, Inc. v. AAG, Inc.*, 385 S.C. 320, 326, 683 S.E.2d 814, 817 (S.C. Ct. of App. 2009). The South Carolina Supreme Court stated it most clearly

35

in *Myrtle Beach Lumber Co., Inc. v. Willoughby,* 276

S.C. 3, 8, 274 S.E.2d 423, 426 (S.C., 1981):

> [A]mbiguous language in a contract should
> be construed liberally and most strongly
> in favor of the party who did not write or
> prepare the contract and is not
> responsible for the ambiguity; and any
> ambiguity in a contract, doubt, or
> uncertainty as to its meaning should be
> resolved against the party who prepared
> the contract or is responsible for the
> verbiage.

*See also Southern Atlantic Financial Services, Inc.*

*v. Middleton*, 349 S.C. 77, 84, 562 S.E.2d 482, 486

(S.C.App. 2002). Accordingly, Appellant requested

to charge the jury to construe against the drafter.

(App. 19-29, 296-311)

Specifically, Appellant requested the following

jury charges both in the Request to Charge filed

with the court and again in the charge conference

before this court:

**2.1** "A contract is ambiguous when the terms of the contract are inconsistent on their face, or are reasonably susceptible of more than one interpretation."[7]

**2.2** "[A]n ambiguous contract is one capable of being understood in more ·senses than one, an agreement obscure in meaning...or having a double meaning."[8]

**2.3** "Ambiguous language in a contract should be construed liberally and most strongly in favor of the party who did not write or prepare the contract and is not responsible for the ambiguity; and any ambiguity in a contract, doubt, or uncertainty as to its meaning should be resolved against the party who prepared the contract or is responsible for the verbiage."[9]

**2.4** "After all, the drafting party has the greater opportunity to prevent mistakes in meaning. It is responsible for any ambiguity and should be the one to suffer from its shortcomings."[10] Stated another way, a

---

[7] *Hawkins v. Greenwood Dev. Corp.,* 328 S.C. 585, 592, 493 S.E.2d 875, 878 (Ct.App.1997).
[8] *Carolina Ceramics, Inc. v. Carolina Pipeline Co.,* 251 S.C. 151, 155-56, 161 S.E.2d 179, 181 (1968) (citation omitted).
[9] *Myrtle Beach Lumber Co., Inc. v. Willoughby,* 276 S.C. 3, 8, 274 S.E.2d 423, 426 (1981) (quoting 17A C.J.S. Contracts § 324).
[10] *Bazzle v. Green Tree Financial Corp.,* 351 S.C. 244, 262, 569 S.E.2d 349, 358 (2002), *vacated on other grounds,* 123 S.Ct. 2402, 156 L.Ed.2d 414 (2003).

> contract can be construed against the
> party who drafted the agreement.

(App. 21)

These were the charges that Appellant's counsel most vigorously requested, and the Court took the matter under advisement before specifically denying Appellant's requests in regards to the above charges. In hindsight, it is particularly clear that this charge would have been critical to a jury considering the ambiguity of the handwritten terms.

Clearly, the proposed instruction was correct. Moreover, the proposed instruction was not substantially covered by the court's charge to the jury. Most importantly, the instruction dealt with the central task before the jury: Construing the contract between the parties. The failure to give the requested instruction seriously impaired Appellant's ability to make its case; Appellee turned the ambiguity for which it was responsible into a defense. *See Noel v. Artson*, 641 F.3d 580, 586-87 (4th 2011 *citing Teague v. Bakker,* 35 F.3d 978, 985 (4th Cir.1994).

The Fourth Circuit in *Nehi Bottling Co., Inc. v. All-American Bottling Corp.*, 8 F.3d 157, 162 (4th Circuit 1993)(applying Virginia law) states that when a contract is ambiguous "then the construction of the contract is for the jury under proper instructions from the court, even though the evidence [is] not conflicting." (Virginia law as outlined in *Nehi Bottling Co.* is the same as South Carolina law as briefed here.) The Court found that charging the jury to construe the contract against the drafter to be proper. *Id.*

In its order denying Appellant's motion of a new trial, the District Court held that the contract was an oral contract. The District Court's sole authority upon which it based its ruling was 17 CJS Contracts §82 (2011), which it quoted as follows, "[a]n agreement containing both oral and written terms is considered an oral contract, even if there are written documents supporting the existence of the contract and those documents are *construed* as part of the contract."

(App. 609-610). First, no South Carolina court has ever adopted such a rule of law, which could radically alter one of the most well established rules of construction in South Carolina law. This all or nothing approach ignores the underlying policy choice for construing an ambiguous contract against the drafter:

> The reason for the rule of strict construction against the party preparing the contract is that one who speaks or writes can, by exactness of expression, more easily prevent mistakes in meaning more than one with whom he is dealing, and that he who has brought the agreement into existence and is thus primarily responsible for its inadequacy should justly suffer for its shortcomings.

*Willoughby,* 276 S.C. at 8, 274 S.E.2d at 426.

It also ignores the basics of contract law: The elements of a contract are offer, acceptance, and valuable consideration. *Sauner v. Pub. Serv. Auth. of South Carolina,* 581 S.E.2d 161, 166 (S.C.2003). The July 26, 2005 letter meets all of the elements. "In order for there to be a binding contract between parties, there must be a mutual

manifestation of assent to the terms [of the contract]." *Edens v. Laurel Hill, Inc.,* 247 S.E.2d 434, 436 (S.C.1978). The July 26, 2005 letter required Davis to sign and return. "Acceptance of an offer is a manifestation of assent to the terms thereof made by the offeree in a manner invited or required by the offer." Electro Lab of Aiken, Inc. v. Sharp Const. Co. of Sumter, Inc., 357 S.C. 363, 369, 593 S.E.2d 170, 173 (S.C.App.,2004) *quoting* Restatement (2d) Contracts §50. The jury expressly found that there was a contract between the parties, and there is substantial evidence that the July 26 offer letter was the contract between the parties. In finding that there was an oral contract at the exclusion of all other findings of fact invades the province of the jury; the District Court's duty was to charge the jury the law and allow the jury to make the findings of fact.

Secondly, the proposition for which 17 CJS §82 cites only one case to support its assertion: *Respect Inc. v. Committee on Status of Women,* 781

F.Supp. 1358 (N.D.Ill.,1992). First, this was a statute of frauds case; the issue of construction of the written terms was not decided, but whether the contract satisfied the statutory requirement of a written contract. However, if there are written terms that are ambiguous, these terms still must be construed; in this case, the jury was given no guidance as to construction of ambiguous agreements.

The District Court's ruling is out of step with South Carolina law, which may be best exemplified in *Mathis v. Brown & Brown of S. Carolina, Inc.*, 389 S.C. 299 698 S.E.2d 773 (2010), *reh'g denied* (Sept. 22, 2010). In that case, Mathis, who was employed with Carolina First, met with his former employer (Brown & Brown) about returning to work for them. *Id.* at 775. In August 2004, Brown & Brown "verbally offered Mathis a salary of $90,000 per year for the first year of employment with [Brown & Brown] as well as a 20% commission on new business generated by Mathis." *Id.* The company

later sent an email with new terms, including "if you are meeting your goals and achievements, doing your part and we will make sure we do our part and you are taken care [of] going forward." *Id.* at 776. However, orally it was represented that corporate headquarters would pay part of his salary. *Id.* The email contained no mention of a start date, company benefits, and the goals, which had been subject to negotiation. *Id.*

After a relationship soured, the company fired Mathis. Mathis sued alleging that the e-mail was the basis for a written contract. *Id.* The Supreme Court found that the email constituted a two year employment agreement, despite the fact that terms regarding corporate assistance, goals, and start date were omitted from the writing. *Id.* at 777-78. However, the Court reasoned, "even if the language [of the e-mail] creates an ambiguity, a court will construe any doubts and ambiguities in an agreement against the drafter of the agreement. *Id.*

In addition, the District Court's order denying Appellant's motion for new trial relied on an unverified response to a request to produce in holding: "In light of Plaintiff's concession that the contract at issue in this case was oral, a jury charge on construing ambiguous contracts was irrelevant to the issues of this case." Appellee requested all documents constituting, reflecting or referring to a contract: Appellant's counsel response contained the following: "The contract was oral, although the July 26, 2005 letter was an attempt to memorialize the oral promise of a 1% new work bonus. This letter was an attachment to Plaintiff's Complaint." (App. 460) There were no requests to admit which sought an admission or a stipulation.

Based upon evidence presented at trial and the controlling law, Appellant's counsel concluded this earlier opinion was probably wrong and there were various alternatives available to a jury.

Appellant's counsel argued for the requested jury charges as follows:

> **Mr. Arnold:** My position is — and, look, I got to tell you, it kind of changes because, look, I think there is different ways to characterize it. I think you could say, look, you had an oral contract memorialized by a letter. I think you could say you had an oral offer that culminated in a written contract with an oral term. Or you could say you have an oral and written contract.
>
> The idea that the jury has to say, its either A or B, the jury can make any decision based on the law after charging on the law as the facts support. And there's also this idea of, you know—could you charge —it could be oral, it could be in writing or it could be oral and in writing.
>
> So, look, I think —and Tom [Davis] always referred to this as his contract. So I think what the evidence supports and my view is that we have an oral offer and acceptance communicated through Jody Kerns, that was later put in writing by Dave Barrows with authority of Paul Bechard. And later there is conduct and communications related to this.
>
> So I think the jury could conclude the various options mentioned. So if they conclude this is a written contract or part of a contract and this is the written part then I think the ambiguity charge makes sense.

(App. 300–301)

Certainly not a model of clarity or eloquence, but neither is it a concession.[11]

"A stipulation, however, is an express waiver by a party or the party's attorney conceding the truth of some alleged fact for the purposes of trial." *Bell v. U.S.*, 521 F.Supp.2d 456, 460 (D. Md. 2007) *citing Vander Linden v. Hodges,* 193 F.3d 268, 279 (4th. Cir.1999). A stipulation may not be implied. *Id.* There was no express waiver by Appellant conceding the truth of some alleged fact; there was no response to a Rule 36 request for admission on this subject. However, the District Court found that Appellant had in fact stipulated that the contract was oral, upon which it based its decision not to charge the jury on construing ambiguous written terms in an employment contract.

The court made two errors which impaired its exercise of discretion: First, the court found that the contract between the parties was oral,

---

[11] Appellant's pretrial brief took the position that the contract was written with a term supplied orally.

even if it contained written terms. Second, the court found that Appellant had stipulated to an oral contract. Both were errors, and the resulting denial of Appellant's request to charge was an abuse of discretion.

### III. **Appellant is Entitled to An Award of Treble Damages and/or Reasonable Attorney Fees Under S.C. Code Section 41-10-80(c)**.

The jury found that MPW breached a contract for the payment of a new work bonus, which constitutes "wages" as defined by South Carolina Code § 41-10-10(2).[12] The failure to pay "wages due" is a violation of both §41-10-40 and §41-10-50. South Carolina Code § 41-10-80(c) (2011) provides:

> **In case of any failure to pay wages** due to an employee as required by Section 41-10-40 or 41-10-50, <u>the employee may recover in a civil action an amount equal to three times the full amount of the unpaid wages, plus costs and reasonable attorney's fees as the court may allow.</u> Any civil action for the recovery of wages must be commenced within three years after the wages become due.

---

[12] The Parties agreed that upon a finding of the existence and a breach of contract to pay the new work bonus, the Court could enter judgment under the wage payment statute.

(emphasis added). The statute does not require an award of reasonable attorney fees to a prevailing party, but does grant the Court discretion to award such fees based upon a "balancing approach." *See e.g., Futch v. McAllister Towing of Georgetown, Inc.,* 335 S.C. 598, 518 S.E.2d 591 (1999). However, the District Court order denied Appellant's request for attorney fees and costs "[b]ased upon the inconsistency in the understanding of how the new work bonus would be calculated and whether the bonus was properly authorized...." (App. 604) Because these two findings are at odds with the evidence and the law, the District Court abused its discretion in denying Appellant treble damages and/or attorney fees.[13]

---

[13] The courts of South Carolina utilize the six factors in determining the amount of fees to award under the SCPWA: (1) The nature, extent, and difficulty of the case; (2) the time necessarily devoted to the case; (3) the professional standing of counsel; (4) the contingency of compensation; (5) the beneficial results obtained; and (6) the customary legal fees for similar services. See, e.g., Rice v. Multimedia, Inc., 318 S.C. 95, 100,

**A. Applying the "Balancing Approach" of Futch, this Court Should Reject Appellee's Belated Assertion of the Good Faith Defense.**[14]

In *Rice v. Multimedia, Inc.*, 318 S.C. 95, 456 S.E.2d 381 (1995), the South Carolina Supreme Court overturned an award of treble damages but affirmed an award of attorney fees under §41-10-80(c). The Court applied a good faith/willfulness standard to the review of the award of treble damages. "As a policy matter this appear[s] just to all parties. If there is a dispute over unpaid wages the employer acts at his peril, and the court in its discretion may award treble damages when the withholding was unreasonable and there was no good faith wage dispute." *Id.* at 383.

However, in support of its position in *Rice*, the Supreme Court relied on *Linder v. Paramount*

---

456 S.E.2d 381, 384 (S.C. 1995). However, the District Court did not reach this point in its analysis and thus, if this Court finds attorney fees are appropriate, a remand for the Court's evaluation of the fee petition based upon these elements would be necessary.

[14] No such defense was plead in Defendant's Answer.

*Acceptance Corp.*, 291 S.C. 539, 354 S.E.2d 567, (S.C. Ct. App. 1987), which enforced the wage payment statute's predecessor. In finding the employer had violated the statute's notice provisions, the Court held as follows:

> "[H]aving failed to do so, [the Employer] is in no position to assert that [the Employee] must establish a lack of good faith and we so hold. We next summarily reject [the Employer's] contention that the trial judge erred by submitting the good faith issue as a defense; we approve of the trial judge's charge on this issue; it was decided by the jury against [the Employer] and there is evidence of record to support their finding."

*Id.* at 543, 354 S.E.2d at 569. The Court in *Rice* had relied on the interpretation of the prior law that the employer may establish good faith as a defense, but it was not the employee's burden. Of course, this is the law to all affirmative defenses.

In *Futch v. McAllister Towing of Georgetown, Inc.*, 335 S.C. 598, 612, 518 S.E.2d 591, 598 (1999) the Supreme Court reversed the Court of Appeals, which had held that an employee who breaches the

duty of loyalty forfeits all "wages due." The plaintiff had breached the duty of loyalty, but had proved that he was nonetheless owed some compensation for a time period when he was not disloyal. Although the Court reinstated a jury verdict of $4,200 to plaintiff, the Court declined to award attorney fees. The Court noted that the "the Legislature did not intend to prevent employers or counterclaims against employees." *Id. at* 605, 518 S.E.2d at 598. In evaluating the defense asserted by the employer in *Futch*, the Court announced that "the balancing approach we adopt today is a new development in South Carolina employment law." *Id.* at 612,518 S.E.2d at 598. The Court simply determined that it would be "unfair" to award attorney fees under §41-10-10 "because the rules of liability were not fully developed when the case was tried." *Id.* (emphasis added).

The South Carolina Court of Appeals reversed an award of treble damages and attorney fees under

§41-10-80(c) in *O'Neal v. Intermedical Hosp. of S. Carolina,* 355 S.C. 499, 510-11, 585 S.E.2d 526, 532 (S.C. Ct. App. 2003). The Court found that there was a bona fide dispute and "that the imposition of the award of attorney's fees was also improper pursuant to *Futch v. McAllister Towing of Georgetown, Inc.,* 335 S.C. 598, 518 S.E.2d 591 (1999) and *Rice v. Multimedia, Inc.,* 318 S.C. 95, 456 S.E.2d 381 (1995)." However, the Court of Appeals did not give any written analysis of the "balancing approach" adopted by *Futch* but did not question or disturb or distinguish the result in *Rice,* in which the Court had upheld attorney fees but reversed an award of treble damages.

In 2005, the Fourth Circuit considered whether finding of bad faith was required to support an award of treble damages under §41-10-80(c) in *Wall v. Fruehauf Trailer Services, Inc.,* 123 F. App'x. 572, 579-80 (4th Cir. 2005)(unpublished).[15] The

---

[15] Citation to this case is permitted under Fourth Circuit Rule of Appellate Procedure 32.1 (2011)

Court noted that under South Carolina law "a specific finding of bad faith or willfulness is not required." *Id. citing Rice v. Multimedia, Inc.,* 318 S.C. 95, 456 S.E.2d 381 (S.C.1995); *Futch v. McAllister Towing of Georgetown, Inc.,* 335 S.C. 598, 518 S.E.2d 591 (1999); *O'Neal v. Intermedical Hospital of South Carolina,* 355 S.C. 499, 585 S.E.2d 526 (2003). This is consistent with the rule that employers may assert affirmative defenses, including a defense of a good faith / *bona fide* dispute, recognized in the cited cases; however, an employer asserting such a defense has the burden of proof on such a defense. *See Wall* at 579-80. Absent such a finding, the Court may exercise its discretion and award reasonable treble damages attorney fees.

---

which states "If a party believes, nonetheless, that an unpublished disposition of this Court issued prior to January 1, 2007 has precedential value in relation to a material issue in a case and there is no published opinion that would serve as well, such disposition may be cited if the requirements of FRAP 32.1(b) are met." The copy of the opinion attached hereto satisfies FRAP 32.1(b).

However, perhaps the case with the most application to the present case is *Mathis v. Brown & Brown of S. Carolina, Inc.,* 389 S.C. 299, 698 S.E.2d 773 (2010), *reh'g denied* (Sept. 22, 2010), in which the Supreme Court stated that in determining whether there is a "bona fide defense or good faith dispute," the Court should not consider every argument the employer has asserted during the litigation. The Court stated it is not the "lists…of the arguments set forth in its brief" which was important to assess an employer's good faith dispute, but instead it was the arguments advanced by the employer at the time of the failure to pay wages. "However, the relevant date for determining whether the employer/defendant reasonably withheld wages is the time at which the wages were withheld, i.e., when the employer allegedly violated the Act." *Id. at* 315-16, 698 S.E.2d at 781-82.

So, the important inquiry is not whether Appellee's last ditch defenses of "meeting of the

minds" or "lack of authority" present effective defenses to the underlying action, but whether Appellee's first reason(s) asserted at the time constituted a "good faith dispute." In Appellee's Answer, MPW did not defend against Appellant's claims based because there was a "bona fide, good faith dispute" or claim that Davis suffered from a misunderstanding of the "new work bonus" promised in his offer letter. Instead, at the time the dispute arose, Appellee asserted three affirmative defenses: Laches, estoppel and unclean hands. In the summer of 2008, the Appellee's position was that Davis had concocted a scheme to defraud Appellee. This was very different than the other defenses the Appellee asserted at trial, which was rejected by the jury but apparently adopted by the District Court in denying Appellant's request for treble damages and/or attorney fees.

In regards to "unclean hands" and "estoppel," consider Appellee's factual basis of these defenses: Appellee asserted that "Plaintiff

concocted a scheme to further defraud Defendant by pretending to be entitled to over $100,000 in back bonuses he *knew* he had not earned…." (App. 468) Appellee also claimed in regards to its asserted defense of laches that Plaintiff had fabricated his story and had "failed to raise [the bonus] in person with his supervisors during his tenure of employment." These original positions proved so contrary to the evidence that Appellee's legal counsel abandoned the arguments to the jury that Davis claims were fraudulent in lieu of the defense that the claim for the new work bonus was all some misunderstanding (i.e., no "meeting of the minds"). However, these are original defenses the District Court should have evaluated when deciding Appellee's good faith not the defense constructed by its legal counsel at trial.

The District Court's order finding that a good faith and bona fide dispute existed, ignored facts, which compel a finding of bad faith in light of the Appellee's original justifications:

- Appellant was provided an offer letter dated July 26, 2005 which specifically promised that he was to be paid a new work bonus, which Appellee initially denied ever existed. (App. 442)

- Paul Bechard, General Manager of Appellee at the time of Davis' employment testified that Davis earned the bonus and should be paid the bonus. (App. 589-590)

- Bechard testified that he pleaded with management to pay the bonus but was ignored. He further testified: "I expressed my disappointment, you know from a credibility standpoint promising people things that weren't delivered upon." (App. 589-590)

- Bechard further testified that "when you promise someone that your team's that working hard is going to be incentivized to grow the business, you know, it's — it's only right that, you know, you follow through on your — on your commitments." (App. 563, lines 18-22)

- Davis testified (and email corroborates) that he sent an email on April 23, 2006 which alerted the John Fuertes (Barrow's replacement) of the new work bonus, which was ignored. (App. 447)

- Davis testified (and emails corroborate) that in September 2006, Davis again raised the issue of his new work bonus. (App. 449, 450)

- Bechard testified that he advised the CFO that "we had made a promise to our team and it would be smart to make good on — make good on that promise." (App. 560).

- Davis testified that he had repeated discussions with the director of human resources (Neville) and the General Manager (Bechard) beginning in October 2006 about his new work bonus. During these discussions Neville and Bechard reassured Davis that MPW had every intention of paying him and at each delay would indicate that MPW was merely working on a payment schedule. (App. 74-77, 80-82, 86-87, 450-451, 447-449)

However, if you discredit Bechard's testimony about his attempts to get the Davis bonus paid, the failure to investigate is proof of bad faith. Monte Black, President and CEO of MPW, testified that he knew about the issue of the new work bonus before Davis' termination but failed to inquire into the specifics or to even look at the Davis offer letter. (App. 288-290) The Vice-President of Human Resources testified that he did not investigate Davis' claim. (App. 263, 267) The Fair Labor Standards Act, which also has a good faith defense to liability for liquidated damages, does not permit an employer to "simply remain blissfully ignorant of FLSA requirements." *Burnley v. Short*, 730 F.2d 136, 140 (4th Circ. 1984). As the District

Court in *Rogers v. Savings First Mortgage, LLC*, 362 F.Supp.2d 624, 638 (D.Md. 2005)(emphasis added) pointed out:

> Courts have consistently held that ignorance of the FLSA's requirements is not a defense to liquidated damages: [T]he presumption of willfulness stands, absent positive and compelling proof of good faith. It is not enough, for instance, to plead and prove ignorance of the wage requirements. Knowledge will generally be imputed to the offending employer .... Nor does the complete ignorance of the possible applicability of the [FLSA] shield the employer from liability for liquidated damages.... **Good faith requires some duty to investigate potential liability** under the [FLSA].

*See also* S.C. Code §41-10-60 (2011) (requiring written notice of amount disputed.) MPW cannot remain blissfully ignorant of the facts supporting Davis' claim, accuse him of fraud, then claim a simple misunderstanding as the basis of its legal defense and argue that it acted in good faith at the time Davis initially sought payment of the bonus.

There was no inconsistency in the language of the July 26, 2005 letter: The bonus was to be

calculated based upon an "increase in the BMW contract." However, any inconsistency arises from Appellee's violation of S.C. Code §41-10-30(A)(emphasis added), which reads:

> **Every employer shall notify each employee in writing at the time of hiring of** the normal hours and **wages agreed upon,** the time and place of payment, and the deductions which will be made from the wages, including payments to insurance programs. The employer has the option of giving written notification by posting the terms conspicuously at or near the place of work. Any changes in these terms must be made in writing at least seven calendar days before they become effective. This section does not apply to wage increases.

At the time Davis was hired to be the BMW account manager, it was Appellee's legal obligation to put all the material terms in writing and in reasonably clear language.

However, Appellee was able to convince the District Court that it's own violation of the S.C. Wage Payment Statute was a defense to attorney fees and treble damages.

The S.C. Court of Appeals in *Ross v. Ligand Pharmaceuticals, Inc.,* 371 S.C. 464, 472, 639

S.E.2d 460, 465 (S.C. Ct. App. 2006) held that a failing to provide time and place for payment of commissions earned as required by §41-10-30(A) is relevant to the determination of bona fide dispute. *Ross,* the Court cited the violation in awarding treble damages and attorney fees. *Id.* A truly balanced approach as dictated in *Futch* would shift the risk of non-compliance with the act's notice provisions to the law breaker in this case as it did in *Ross v. Ligand.*

Moreover, *Futch* found that it would be "unfair to penalize Employer because the rules of liability were not fully developed when the case was tried." *Futch v. McAllister Towing of Georgetown, Inc.,* 335 S.C. 598, 612, 518 S.E.2d 591, 598 (1999). In this case, the requirements of §41-10-30(A) were fully developed when Appellee violated this provision as were all the other rules of liability relevant to the inquiry of a bona fide dispute; it would be unfair to the Appellant to shift the costs of non-compliance to Appellant. As

the Supreme Court in *Rice* warned, "if there is a dispute over unpaid wages the employer acts at his peril…." *Rice,* 318 S.C. at 99, 456 S.E.2d at 383. In this case, it would not only be unfair to deny treble damages and/or attorney fees to Appellant in light of the fact that Appellees's own violation of the wage payment statute contributed to the dispute, but when combined with all the other evidence of bad faith, such a denial is an abuse of discretion.

**B.    In Applying the "Balancing Approach" This Court Should Consider the Remedial Purpose of the Act and Public Policy For Awarding Attorney Fees.**

South Carolina courts have uniformly recognized that the purpose of treble damages is to punish the employer.  However, as with other employment rights statutes, an award of attorney fees serves the remedial purpose of these laws.  And, thus any balancing of interests should take into account this distinction in deciding whether to award attorney fees.  Factoring in the remedial purpose

of the South Carolina Wage Payment statute further weighs in favor of granting Appellant's request for reasonable attorney fees.

As the Fourth Circuit has pointed out in weighing a discretionary award of fees under ERISA, a Court should "consider the remedial purposes of ERISA to protect employee rights and secure effective access to federal courts." *Williams v. Metro. Life Ins. Co.,* 609 F.3d 622, 636 (4th Cir. 2010). Similarly, the courts have pointed out that an award of attorney fees in employment rights cases is necessary to achieve a "make whole" remedy. *See e.g., Zack v. City of Minneapolis,* 601 F. Supp. 117, 120 (D. Minn. 1985)("The provision for attorneys' fees in Title VII is clearly linked to the 'make whole' purpose of the act."). Lawsuits enforcing employee rights statutes vindicate policies that the legislature consider highly important. *See e.g. Safranek v. Copart, Inc.,* 379 F. Supp. 2d 927, 930-31 (N.D. Ill. 2005)(citations omitted)("[A] plaintiff in any

civil rights suit acts 'not for himself alone but also as a private attorney general,' vindicating a policy that Congress considered of the highest importance."

Importantly, the Fourth Circuit has articulated such a balancing test in ERISA cases, which has a discretionary attorney fee provision similar to the S.C. Wage Payment Act. In *Quesinberry v. Life Ins. Co. of N. Am.,* 987 F.2d 1017, 1029 (4th Cir. 1993) the Court adopted "a five factor test to guide the district court's exercise of discretion in awarding attorneys' fees under ERISA. The five factors are:

> (1) degree of opposing parties' culpability or bad faith;
>
> (2) ability of opposing parties to satisfy an award of attorneys' fees;
>
> (3) whether an award of attorneys' fees against the opposing parties would deter other persons acting under similar circumstances;
>
> (4) whether the parties requesting attorneys' fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA itself; and

(5) the relative merits of the parties' positions.

In this test, bad faith is an element, but just one of several that the court weighs. This is nothing more than a specific articulation of a balancing approach endorsed by *Futch.*

It is clear that in addition to considering the lack of good faith addressed above, this Court could take into account opposing party's ability to satisfy such award. Moreover, it can hardly be argued that an award of attorney fees in a case such as this would have a deterrent effect on similar violations of the wage payment act (not only the failure to pay wages but also the failure to more clearly state the "wages agreed upon.") The fourth element is not applicable in this sort of case because there was no policy or plan at issue, however, gaining clarity on the standard of awarding attorney fees may benefit workers enforcing their rights under the wage payment statute. Finally, the relative merits of the

parties' positions have been made clear by the findings of the jury.

"[T]he South Carolina Payment of Wages Act is remedial legislation designed to protect working people and assist them in collecting compensation wrongfully withheld." *Long v. Boston Scientific Corp.*, 665 F. Supp. 2d 541, 553 (D.S.C. 2008)(citation omitted). This remedial purpose of the statute should be factored into a balancing approach when considering a petition for fees under §41-10-80(c). Although a bona fide good faith dispute is clearly a consideration in awarding fees under §41-10-80(c), this Court should take into account all relevant factors in exercising its discretion, including those considered by the Fourth Circuit in addressing employee rights. This approach is not only consistent with the tradition and precedent in enforcing employment rights, but it is consistent with any notion of a true balancing approach mandated by *Futch.*

## CONCLUSION

The District Court abused its discretion in failing to grant Appellant a new trial. Accordingly, Appellant requests that this Court reverse the District Court and grant a new trial on the issue of damages or on all issues. However, in the alternative, Appellant requests that this Court reverse the District Court's order finding that Appellant was not entitled to treble damages and/or attorney fees and remand this case for further proceedings by the District Court to determine reasonable attorney's fees and enter judgment for Appellant in the amount of three times damages and attorney's fees.

Counsel for Appellant respectfully requests oral arguments before this Court.

Respectfully submitted,

**Law Office Of W. Andrew Arnold, P.C.**

W. Andrew Arnold
Federal ID No. 5947
712 E. Washington Street
Greenville, SC 29601
864.242.4800 864.242.4885 fax
aarnold@aalawfirm.com
ATTORNEY FOR APPELLANT

67

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

This Appellant's Brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B). The Brief contains 10,645 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using 14-point Courier font in Microsoft Word.

_____
Attorney for Appellant
Dated August 14, 2012

FILING AND MAILING CERTIFICATE

I hereby certify that on this 16th day of August 2012, I filed with the Clerk's Office of the United States Court of Appeals for the Fourth Circuit the required copies (8) of this Brief of Appellant and (6) six copies of the joint appendix and further certify that I mailed this same date from Richmond, Virginia the required copies to opposing counsel.

The necessary filing and mailing was performed in accordance with the instructions given me by counsel in this case.

_Barbara E. Grove_

The Appellate Link
6020 Bremo Road
Richmond, VA    23226
(804) 698-9471

Opposing Counsel Served:

Jeffrey Parker Dunlaevy
Phillip A. Kilgore
OGLETREE, DEAKINS, NASH
  SMOAK & STEWARD, PC
P. O. Box 2757
Greenville, SC    29602-0020
864-271-1300

123 Fed.Appx. 572
This case was not selected for
publication in the Federal Reporter.
Not for Publication in West's Federal Reporter
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial decisions
issued on or after Jan. 1, 2007. See also Fourth
Circuit Rule 32.1 (Find CTA4 Rule 32.1)
United States Court of Appeals,
Fourth Circuit.

Darrell WALL, Plaintiff-Appellee,

v.

FRUEHAUF TRAILER SERVICES,
INCORPORATED, a subsidiary of Wabash
National Corporation, Defendant-Appellant.

No. 03-2091. | Argued: Sept. 29,
2004. | Decided: Feb. 24, 2005.

## Synopsis

**Background:** Former employee brought suit alleging that employer violated South Carolina's Payment of Post-Termination Claims to Sales Representatives Act (PPTCSRA), and breached its contract when it refused to pay the employee sales commissions. The United States District Court for the District of South Carolina, Terry L. Wooten, J., entered judgment in favor of the employee, and the employer appealed.

**Holdings:** The Court of Appeals, Roger W. Titus, United States District Judge for the District of Maryland, sitting by designation, held that:

[1] determination that good cause existed to allow former employee to amend his complaint to replace the PPTCSRA claim with a claim under the South Carolina Payment of Wages Act (PWA) and a claim for treble damages was a proper exercise of discretion;

[2] district court did not lose subject matter jurisdiction when it allowed the replacement of claims;

[3] testimony by former employee's replacement was relevant and not excludable as hearsay; and

[4] award of treble damages and attorney's fees under the PWA was not an abuse of discretion.

Affirmed.

**\*574** Appeal from the United States District Court for the District of South Carolina, at Greenville. Terry L. Wooten, District Judge. (CA-01-1959-6-25).

**Attorneys and Law Firms**

Richard James Morgan, McNair Law Firm, P.A., Columbia, South Carolina, for Appellant.

Justin Marshall Grow, Greenville, South Carolina, for Appellee.

Reginald W. Belcher, McNair Law Firm, P.A., Columbia, South Carolina, for Appellant.

Brian P. Murphy, Greenville, South Carolina, for Appellee.

Before MICHAEL and MOTZ, Circuit Judges, and ROGER W. TITUS, United States District Judge for the District of Maryland, sitting by designation.

**Opinion**

Affirmed by unpublished opinion. Judge Titus wrote the opinion, in which Judge Michael and Judge Motz joined.

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

TITUS, District Judge.

On March 12, 2001, Darrell Wall ("Wall") filed a complaint in the Court of Common Pleas for the County of Greenville, South Carolina alleging that Fruehauf Trailer Services, Inc. ("Fruehauf") violated the Payment of Post-Termination Claims to Sales Representatives Act, S.C.Code Ann. §§ 39-65-10, et seq. (Supp.1999), and breached its contract with Wall when it refused to pay Wall sales commissions. Fruehauf removed the case to the United States District Court for the District of South Carolina, Greenville Division, on April 11, 2001. On February 27, 2002, the District Court [1] granted leave to Wall to file a Second Amended Complaint which would replace Wall's claim under §§ 39-65-10, et seq., with a claim under the South Carolina Payment of Wages Act, S.C.Code Ann. §§ 41-10-10, et seq. (Supp.2003), and a claim for treble damages pursuant to §§ 41-10-80(C). On March 13, 2002, Wall filed his Second Amended Complaint. After a trial, the jury returned a $35,000 verdict in favor of Wall on February 11, 2003. On July 25, 2003, the District Court awarded Wall treble damages, attorney's fees and costs pursuant to §§ 41-10-80(C).

1  The order granting leave for the filing of a Second Amended Complaint was entered for the District Court by a Magistrate Judge.

In its appeal, Fruehauf challenges the following actions of District Court: (1) the Order granting Wall's Motion To File Second Amended Complaint; (2) the decision to retain diversity jurisdiction over the case after Wall voluntarily dismissed his claim for violation of §§ 39-65-10, et seq.; (3) the decision to award Wall treble damages, attorney's fees and costs; (4) the admission of the testimony of Mike Dodson; (5) the interpretation of §§ 41-10-10, et seq. For the reasons set forth below, we affirm.

## I.

Wall was employed by Fruehauf (or its predecessor companies) from September 1994 until September 2000 selling new and used trailers. Fruehauf compensated Wall **\*575** with a base salary and commissions based on Fruehauf's gross profit margin on his sales. According to Fruehauf, beginning in 1996, the company limited the maximum commissions per year to $50,000 per account. Fruehauf's position is that this limitation was distributed in writing to all salespersons, including Wall, on two separate occasions in 1996. However, Wall maintains that Fruehauf never informed him of this limit on commissions.

In 1999, Wall earned $77,316.85 in commissions from the purchase of trailers by D.M. Kaye and Sons Transport, and Fruehauf paid him all of the commissions to which he was entitled in the absence of the $50,000 limitation. During the first part of 2000, Fruehauf discovered that it had overpaid Wall for his 1999 earned commissions in the amount of $35,000. Thus, Fruehauf incrementally withheld approximately $27,000 from subsequent commissions Wall earned in 2000. Additionally, Fruehauf deducted $8,000 from commissions earned on other accounts in 2000. Wall asserts that this deduction for excess commissions was the first time in history that Fruehauf had enforced its alleged cap on commissions.

After Fruehauf removed the complaint filed by Wall in the Court of Common Pleas for the County of Greenville, South Carolina to the United States District Court for the District of South Carolina, Greenville Division, an initial scheduling order was issued on September 5, 2001 which, among others, prohibited the parties from amending the pleadings after June 11, 2001. This scheduling order deadline was later extended

by the Court until October 9, 2001. Discovery ended on January 15, 2002 and trial was scheduled to begin on April 11, 2002.

During Wall's deposition, he testified that he had, on occasion, sold tractor trailers to independent owners. As a result, he no longer fit the definition of a sales representative under the Payment of Post-Termination Claims to Sales Representatives Act, S.C.Code Ann. §§ 39-65-10 et seq. *Lee v. Thermal Eng'g Corp.*, 352 S.C. 81, 572 S.E.2d 298, 304 (2002).[2]

2  Section 39-65-10(4) only provides relief to a sales representative who:

   (a) contracts with a principal to solicit wholesale orders;

   (b) is compensated, in whole or in part, by commission;

   (c) does not place orders for purchases for his own account or for resale; and

   (d) *does not sell* or take orders for the sale of products *to the ultimate consumer.* (emphasis added)

After completing discovery and after a status conference held on January 31, 2002, Wall sought leave to amend his complaint to replace his claim under §§ 39-65-10, et seq. with a cause of action alleging a violation of the South Carolina Payment of Wages Act, S.C.Code Ann. §§ 41-10-10, et seq.[3] On February 27, 2002, the District Court granted the motion, reopened discovery and ordered Wall to pay all of Fruehauf's discovery costs associated with investigating the amended claim.

3  Unlike the Payment of Post-Termination Claims to Sales Representatives Act, the South Carolina Payment of Wages Act does not require that Wall not have sold products to the ultimate consumer. S.C.Code Ann. § 41-10-40(C) provides simply that employers "shall not withhold or divert any portion of an employee's wages unless ... the employer has given written notification to the employee of the amount and terms of the deductions ..."

The case went to trial on February 10, 2003, a full year after Wall filed his Second Amended Complaint. On February 11, 2003, the jury returned a verdict for Plaintiff in the amount of $35,000. On February 26, 2003, Wall moved for an order granting treble damages, attorney's fees and costs pursuant to § 41-10-80(C). On July 25, 2003, the trial court granted **\*576** Wall's motion and awarded treble damages in the amount of

$105,000.00, with interest at the rate of 1.13 %, plus attorney's fees and costs.

## II.

Fruehauf argues that the District Court erred in the following ways: (1) it permitted Wall to file a Second Amended Complaint after the close of discovery without establishing good cause pursuant to Federal Rule of Civil Procedure 16(b) and causing prejudice to the Defendant in violation of Federal Rule of Civil Procedure 15(a); (2) it permitted Wall to file a Second Amended Complaint after he had admitted that he could not prove the elements of the claim in his Amended Complaint; and (3) it retained jurisdiction over Wall's claim, despite the "dismissal" of the claim under the Payment of Post-Termination Claims to Sales Representatives Act, S.C.Code Ann. § 39-65-10 which, Fruehauf argues, destroyed federal jurisdiction over the claim by reducing the amount in controversy.[4]

[4]    At several points in its brief, Fruehauf refers to the "dismissal" of a claim asserted by Wall under § 39-65-10. The District Court did not "dismiss" the claim. When the Second Amended Complaint was filed, it had the effect of superseding the earlier complaint (which contained the claim under § 39-65-10) which "no longer performs any function in the case." 6 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice And Procedure § 1476. (2d ed.1990). After the Second Amended Complaint was filed, the District Court granted a previously filed motion for summary judgment as to the § 39-65-10 claim, but this action was a nullity because that claim was no longer before the Court.

This Court reviews a district court's decision to grant leave to amend and the decision to retain jurisdiction of a claim under an abuse of discretion standard. *See Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); *Shanaghan v. Cahill,* 58 F.3d 106, 112-13 (4th Cir.1995). This standard "mandates a significant measure of appellate deference to the judgment calls of trial courts." *United States v. Pittman,* 209 F.3d 314, 316 (4th Cir.2000).

### A. Leave to File Second Amended Complaint

[1]    Federal Rule of Civil Procedure 16(b) provides that a scheduling order devised by the District Court "shall not be modified except upon a showing of good cause and by leave of the district judge or, when authorized by local rule, by a magistrate judge." This Court has noted that scheduling orders "are not set in stone, but may be relaxed for good cause,

extraordinary circumstances, or in the interest of justice." *Barwick v. Celotex Corp.,* 736 F.2d 946, 954 (4th Cir.1984). Federal Rule of Civil Procedure 15(a) provides that after a responsive pleading has been served, a party may amend its pleading "only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." Furthermore, leave to amend is a liberal standard and will not be denied unless the amendment will cause actual prejudice to the adverse party. *See Ward Elecs. Serv., Inc. v. First Commercial Bank,* 819 F.2d 496, 497 (4th Cir.1987) (holding that a change in the theory of recovery and one prior amendment is not sufficient to deny a motion to amend the complaint where no evidence of bad faith existed).

Here, the District Court properly exercised its discretion in determining that good cause existed to permit Wall to amend his complaint, pursuant to Federal Rules of Civil Procedure 16(b) and 15(a). Wall moved to file a Second Amended Complaint immediately after his counsel learned that a minor portion of his sales activities involved selling trailers to independent **\*577** owners/operators, an activity that is not covered under S.C.Code Ann. § 39-65-10.

Furthermore, Fruehauf did not suffer any prejudice as a result of the amendment. The trial court reopened discovery, permitting Fruehauf to depose Wall a second time, and ordered Wall to pay all of Fruehauf's associated discovery costs. Moreover, the amendment did not substantively change the claim, only the statute under which the claim proceeded. Both before and after the amendment, the suit was a claim for the same unpaid commissions. Principles of judicial economy would have been sacrificed had Wall not been permitted to amend his complaint because it would have forced Wall to litigate an entirely new and separate action based on the same set of facts under the new statute. *Rowe v. United States Fid. & Guar. Co.,* 421 F.2d 937, 943 (4th Cir.1970) ("the fact that the supplemental pleading technically states a new cause of action should not be a bar to its allowance.") We find no abuse of discretion in the District Court's decision to permit Wall to file a Second Amended Complaint.

### B. Diversity Jurisdiction

[2]    Fruehauf next argues that the trial court erred when it retained jurisdiction over Wall's case after he had "dismissed" his claim under S.C.Code Ann. § 39-65-10.[5] Fruehauf argues that the "dismissal" of Wall's claim under §§ 39-65-10, et seq., destroyed subject matter jurisdiction under 28 U.S.C.A. § 1332(a), because without the ability to prove a necessary element of that statutory claim, Wall had no longer asserted

a claim that caused the amount in controversy to exceed $75,000.[6] However, as Wall correctly points out in his brief, his claim under §§ 39-65-10, et seq. was simultaneously replaced with a claim under S.C.Code Ann. §§ 41-10-10, et seq., which permits a court to award treble damages to an employee who has not been justly compensated, thereby increasing the amount in controversy from the unpaid commissions of $35,000 to $105,000. Thus, the amount in controversy requirement was met and subject matter jurisdiction was maintained. *See Missouri State Life Ins. Co. v. Jones,* 290 U.S. 199, 202, 54 S.Ct. 133, 78 L.Ed. 267 (1933) (holding that where a state statute provides for the award of attorney's fees, those fees can be considered as part of the amount in controversy for the purpose of determining federal diversity jurisdiction). Even if we were to find that the treble damages provision of §§ 41-10-10 was not sufficient to cause the Second Amended Complaint to satisfy the jurisdictional requirement of 28 U.S.C.A. § 1332(a), Plaintiff's initial claim under §§ 39-65-10, et seq. was made in good faith and the District Court had the discretion to retain any residual claims. *Shanaghan,* 58 F.3d at 112; *St. Paul Mercury Indem. Co. v. Red Cab Co.,* 303 U.S. 283, 288, 58 S.Ct. 586, 82 L.Ed. 845 (1938).[7]

5  As noted above in footnote 4, the claim under § 39-65-10 was not "dismissed." Rather, the claim was replaced with a claim under § 41-10-10 which superseded the earlier claim.

6  Section 39-65-10 provides for the award of punitive damages, making the possible amount in controversy in excess of $75,000.

7  Furthermore, as Appellee correctly points out in his brief, even if the Second Amended Complaint did not meet the required amount in controversy for diversity jurisdiction under 28 U.S.C.A. § 1332(a), the doctrine of supplemental jurisdiction would permit the trial court in this instance to retain jurisdiction over this case. 28 U.S.C.A. 1367; *Shanaghan,* 58 F.3d 106, 110 (4th Cir.1995) (citation omitted) (indicating that the doctrine of supplemental jurisdiction is "designed to allow courts to deal with cases involving pendent claims in the manner that most sensibly accommodates a range of concerns and values").

## *578 III.

Fruehauf also appeals the trial court's decision to award Wall treble damages and attorney's fees on the ground that the trial court erroneously relied exclusively on the testimony of

Wall's former General Manager Ned Armstead ("Armstead"). The trial court's decision to award Wall treble damages, attorney's fees and costs is reviewed under an abuse of discretion standard. *See Rice v. Multimedia, Inc.,* 318 S.C. 95, 456 S.E.2d 381, 384 (1995).

Fruehauf argues that the District Court erred when it awarded Wall treble damages and attorney's fees, relying solely on Armstead's redirect testimony that, in Fruehauf's opinion, contradicted his deposition and trial cross-examination testimony. We disagree. Fruehauf argues that on redirect examination at trial, Wall's general manager, Armstead, testified that he was not aware of a commissions cap, whereas in his deposition, Armstead testified that the commissions cap was a company-wide policy that was never rescinded.

First, a trial judge is given a considerable amount of latitude about what credibility to assign the testimony of one witness over another, especially considering the fact that the trial judge is much closer to the actual testimony than the appellate court. *United States v. D'Anjou,* 16 F.3d 604, 614 (4th Cir.1994). Furthermore, in the trial court's July 25, 2003 Order granting Wall treble damages, the court listed a number of factors on which it based its decision, including the following: Fruehauf initially paid Wall the full balance of his commission; Armstead testified that he was not aware of a cap on sales commissions; Fruehauf failed to provide clear evidence that Wall received a written memorandum notifying the salesperson of a cap on sales commissions; the salesperson hired to replace Wall, Mike Dodson, was not notified of a sales commissions cap; Fruehauf withheld undisputed commissions from Wall's pay; and Fruehauf failed to adhere to the notification requirements of the South Carolina Payment of Wages Act. Therefore, the argument that the trial court abused its discretion by only considering Armstead's inconsistent testimony is without merit.

## IV.

Fruehauf also challenges the District Court's evidentiary ruling admitting the testimony of Mike Dodson ("Dodson"), the salesperson who assumed Wall's position after he left Fruehauf, on the grounds that the testimony was irrelevant and impermissible hearsay. We review an evidentiary ruling of a trial court for an abuse of discretion and find no abuse here. *United States v. Abel,* 469 U.S. 45, 54-55, 105 S.Ct. 465, 83 L.Ed.2d 450 (1984).

[3]  We first note that Fruehauf never made any specific hearsay objection to any part of Dodson's testimony; therefore

it cannot be raised now because Fruehauf has failed to properly present this issue for review.[8] For that reason alone, the District Court's ruling on this issue can be affirmed. However, if the issue had been preserved, the ruling would still be affirmed because the District Court did not abuse its discretion in admitting the testimony.

[8]    Fruehauf did file a motion in limine to exclude this testimony, but the motion was overruled by the District Court. "[A]n overruled motion in limine does not preserve error on appeal." *Rojas v. Richardson*, 703 F.2d 186, 189 (5th Cir.1983).

[4]    First, Fruehauf argues that the District Court erred in admitting Dodson's testimony because it was irrelevant. Federal Rule of Evidence 401 defines relevant evidence as any evidence having "any tendency to make the existence of any fact that is of consequence to the determination *579 of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401. Dodson, Wall's immediate replacement, testified as to Fruehauf's compensation policy. Fruehauf argues that because Dodson was not employed by Fruehauf during the relevant time period, his testimony as to Fruehauf's compensation policy is inadmissible; however, as Wall points out, Dodson was his immediate replacement. The fact that Dodson testified that he was not made aware of any commission ceiling is relevant to whether or not Fruehauf had, in fact, established such a policy.

[5]    Second, Fruehauf argues that Dodson's testimony was inadmissible hearsay. The Federal Rules of Evidence define hearsay as a statement, other than one made by the declarant while testifying at a trial or hearing, offered in evidence to prove the truth of the matter asserted. Fed.R.Evid. 801. Dodson did not testify to any out of court statements, but only testified that, to his knowledge, no sales commissions cap was in existence at the time that he was hired. Furthermore, as Wall asserts, any possible hearsay statements to which Dodson would have testified would have been made to him by one of Fruehauf's representatives within the context of its employment relationship with Dodson. Therefore, any statements that were hearsay statements would be excepted from operation of the rule as an admission of a party opponent. Fed.R.Evid. 801(d)(2)(D).

## V.

[6]    Finally, Fruehauf argues that the District Court erred in its interpretation of South Carolina law concerning the South Carolina Payment of Wages Act, S.C.Code Ann. §§ 41-10-10, et seq., when it awarded Wall treble damages and attorney's fees. The District Court's decision to award treble damages, attorney's fees and costs is reviewed for an abuse of discretion. *See Rice*, 318 S.C. 95, 456 S.E.2d 381, 384 (S.C.1995).

Section 41-10-40 (C) of the South Carolina Payment of Wages Act provides that employers "shall not withhold or divert any portion of an employee's wages unless ... the employer has given written notification to the employee of the amount and terms of the deductions ..."[9]

[9]    Furthermore, the Act requires that the employers "notify each employee in writing at the time of hiring of ... the deductions which will be made from [their] wages," and "[T]he employer has the option of giving written notification by posting the terms conspicuously at or near the place of work." § 41-10-30(A). "Any changes in these terms must be made in writing at least seven calendar days before they become effective." *Id.*

In case of any failure to pay wages due to an employee as required by Section 41-10-40 or 41-10-50 the employee may recover in a civil action an amount equal to three times the full amount of the unpaid wages, plus costs and reasonable attorney's fees as the court may allow. § 41-10-80(C).

The South Carolina Supreme Court has interpreted this treble damages provision to mean that the decision to award the penalty of treble damages is discretionary, and the penalty should not be imposed "if there is a good faith dispute over wages allegedly due." *Rice*, 456 S.E.2d at 383. Fruehauf asks us to extend the requirement that there be a bona fide, good faith wage dispute to require that Wall show that Fruehauf *willfully* failed to pay Wall's commissions or did so in *bad faith* in order to receive treble damages. We disagree and find that the trial court's interpretation was not an abuse of discretion.

South Carolina case law does not support Fruehauf's position. Fruehauf cites to a number of cases which discuss punitive *580 damages in general, but not treble damages under § 41-10-80(C). *See, e.g., Carter v. R.C. Jordan Oil Co.*, 301 S.C. 84, 390 S.E.2d 367, 368 (S.C.Ct.App.1990). Although South Carolina law requires that there be no good faith dispute concerning the wages due in order for treble damages to be awarded under § 41-10-80(C), the decision is in the complete discretion of the trial court and no specific finding of bad faith or willfulness is required. *Rice*, 318 S.C. 95, 456 S.E.2d

381 (S.C.1995) (holding that the treble damages provision is not mandatory and will not apply if the trial court determines that a good faith dispute over the wages allegedly due exists); *Futch v. McAllister Towing of Georgetown, Inc.*, 335 S.C. 598, 518 S.E.2d 591 (1999) (holding that an employee who breaches the duty of loyalty to his employer forfeits his right to compensation and creates a good faith dispute over the payment of his wages by virtue of his bad behavior); *O'Neal v. Intermedical Hospital of South Carolina*, 355 S.C. 499, 585 S.E.2d 526 (2003) (holding that the award of treble damages, while a matter of discretion for the trial court, is inappropriate in circumstances where there is a bona fide wage dispute).

Here, the District Court specifically addressed the question of whether a good faith dispute existed over the payment of Wall's wages and determined that based on all of the evidence presented, no dispute existed. The evidence considered by the trial court included that: Fruehauf failed to put its employees on notice of the commission cap as required by § 41-10-30(A); Fruehauf initially paid Wall the "disputed" commission and later deducted the "disputed" amount from Wall's subsequent, undisputed commissions; Armstead, Wall's General Manager, was not aware of any $50,000 cap on commissions; Armstead, after research, determined that the commission cap did not apply to Wall's position; Wall's replacement, Dodson, was never informed of any commission cap.

The trial court is in the best possible position to evaluate the credibility of all the evidence before it and make a determination over whether a good faith dispute existed as to the treble damages. The District Court carefully evaluated all of the evidence before it and we find no abuse of discretion regarding its interpretation of South Carolina law.

*AFFIRMED*

**Parallel Citations**

2005 WL 428781 (C.A.4 (S.C.))

---

**End of Document**

© 2012 Thomson Reuters. No claim to original U.S. Government Works.